# United States District Court

for the
Western District of New York



United States of America
v.

JAROD HAMPSON and
BENJAMIN DIMENTO

Case No. 14-mj-644

## CRIMINAL COMPLAINT

I, S.A. WILLIAM MACMILLAN, DEA, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about July 2014 to in or about September 9, 2014, in the Western District of New York, and elsewhere, the defendants violated **Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) and 846,** offenses described as follows:

From in or about July 2014 to in or about September 9, 2014, the defendants, Jarod Hampson and Benjamin Dimento, did knowingly, willfully and unlawfully combine, conspire and agree together and with others, known and unknown, to commit the following offenses, that is, to possess with the intent to distribute, and to distribute, a mixture and substance containing 3,4-methylenedioxy-N-methylamphetamine, otherwise known as MDMA or ecstacy, a Schedule I controlled substance, and 4-bromomethcathinone (4-BMC), a Schedule I controlled substance analogue as defined in Title 21, United States Code, Section 802(32), knowing that the mixture and substance was intended for human consumption as provided in Title 21, United States Code, Section 813, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) and 846.

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
Complainant's signature

S.A. WILLIAM MACMILLAN, DEA
Printed name and title

Sworn to before me and signed in my presence.

Date: September 9, 2014

_____
Judge's signature
HON. MARIAN W. PAYSON
U.S. MAGISTRATE JUDGE
Printed name and title

City and State: Rochester, New York

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

14-MJ- 644

AFFIDAVIT

-v-

JAROD HAMPSON
BENJAMIN DIMENTO

Defendant.

---

STATE OF NEW YORK   )
COUNTY OF MONROE    )   ss:
CITY OF ROCHESTER   )

Your affiant, **William MacMillan**, having been duly sworn, states the following:

1. I am a Special Agent with the Drug Enforcement Administration (DEA) and, as such, I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21, United States Code, Section 801 et seq., and Title 18, United States Code, Section 2516(1).

2. I have been employed with the DEA since June of 2010. I am currently assigned to the DEA Rochester Resident Office. Prior to my employment with the DEA, I served for approximately 4 years as an officer in the U.S. Coast Guard where, in addition to

other responsibilities, I served as a Boarding Officer, trained at the Federal Law Enforcement Training Center in Charleston, SC. I was charged with enforcing maritime law enumerated in various sections of Title 14, 18, 19, 33, and 46, of United States Code. While attending the DEA Academy, I received 5 months of training on how to conduct investigations involving violations of Title 21 of United States Code, including training directly related to conducting Title III (wiretap) investigations. Since November 2010, I have solely investigated controlled substance violations. During the past 6 years, I have participated in numerous drug investigations ranging from high seas smuggling, illicit internet sales of synthetic controlled substance analogues, and marijuana grow operations. I have been involved in the execution approximately 25 foreign/federal/state boardings/search warrants involving suspected narcotics trafficking. Additionally, your affiant has been a direct participant in surveillance and enforcement operations resulting from several Title III investigations.

2.   As a result of all of the above, I am familiar with the manner in which narcotics and other controlled substances are obtained, packaged, distributed, sold, and used. I am also familiar with the coded language and jargon used by the individuals engaged in narcotics trafficking to reference various narcotics and controlled substances, as well as the ways in which illicit drug sellers and users attempt to disguise their conversations relating to their activity by the use of codes, cryptic phrases, abbreviated words and prearranged terminology.

3.      In addition to investigating the trafficking of controlled substances, I have also received training and participated in numerous investigations involving the importation and distribution of controlled substance analogues, sometimes referred to as "designer drugs." The Analogue Enforcement Act imposes criminal liability through the more general provisions of the Controlled Substances Act, Title 21, United States Code, Section 841(a). Pursuant to Title 21, United States Code, Section 813, "a controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in Schedule I."

4.      The term "controlled substance analogue" means a substance which: (1) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; (2) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or (3) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II. [Title 21 United States Code 802(32)(A)].

5.      Analogue substances have often been referred to generically as "bath salts" or "molly," or in the case of cannabis-type substances, "spice" or "incense." Based upon my recent involvement in several investigations involving synthetic analogues, I am aware that

individuals located in the United States are able to easily order chemicals "on-line" after establishing contact with "chemical research" manufacturers located abroad, generally from the country of China. Once the order is placed via e-mail or through a company's website, the customer's money is transferred overseas, generally through the use of Western Union. Upon receipt of the money, the manufacturer simply mails the chemicals to an address provided by the customer. The mail packages are generally sent via FedEx, UPS or the United States mail. Once the chemicals are received by customers within the United States, I am aware that the chemicals are often marketed as having innocent uses, such as "lady bug attractant," "research chemicals," "glass cleaner," or "plant food/fertilizer." I am also aware that distributors of analogue substances will falsely label the analogue chemicals as "Not for Human Consumption," when in reality that is precisely the intent of the distributor and purchaser.

6.  Analogue substances, like their natural counterparts, are highly dangerous chemicals that are ingested by recreational drug users. They are generally used as a substitute to other, more familiar, controlled substances such as marijuana, MDMA (ecstasy), cocaine, ketamine, PCP, and methamphetamine. I am aware that certain analogues can be ingested orally, smoked, or put into a solution and injected into veins. People who abuse these substances have reported agitation, insomnia, irritability, dizziness, depression, paranoia, delusions, suicidal thoughts, seizures, and panic attacks. Users have also reported impaired perception of reality, reduced motor control, and decreased ability to think clearly. Cathinone derivatives act as central nervous system stimulants causing rapid

heart rate (which may lead to heart attacks and strokes), chest pains, nosebleeds, sweating, nausea, and vomiting.

## PURPOSE OF AFFIDAVIT

7. I make this affidavit in support of the government's application for a criminal complaint which charges JAROD HAMPSON and BENJAMIN DIMENTO with violations of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) and 846.

## PROBABLE CAUSE

8. This case is being investigated by agents with the Drug Enforcement Administration (DEA), New York Division, and agents with the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations (HSI), Buffalo Office. I have personally participated in the investigation of the offenses referred to above, and make this affidavit based on my personal participation in this investigation, and based on reports made to me by other agents and officers and other law enforcement authorities. Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation.

9. Beginning in July 2014, law enforcement, through the use of a confidential source (hereafter "CS"), developed information that an individual named Jarod

HAMPSON was involved in the sale of controlled substance analogues, often referred to as "molly." Specifically, the CS explained that he/she met Jarod HAMPSON through an individual named Nico Chirico, and, based upon that introduction, would be able to purchase "molly" from HAMPSON. By way of background, the CS has been working with law enforcement for approximately 12 months. The CS is currently facing federal narcotics charges, has entered a plea of guilty and has agreed to provide pro-active assistance to law enforcement.

10. Since July 9, 2014, four (4) controlled purchases have been conducted with Jarod HAMPSON. The investigation has determined that the likely source of supply for HAMPSON is an individual named Benjamin A. DIMENTO who currently resides at the Target Residence, that is, 7 Jacques Street, Rochester, New York. The following information supports probable cause to authorize a search warrant of the Target Residence for the items set forth in the Schedule of Items to be Seized (Attachment B).

**Controlled Purchase # 1**

11. On July 9, 2014, HAMPSON agreed to meet with the CS and Nico Chirico for the purpose of selling the CS a quantity of "molly." At approximately 4:06 p.m., surveillance agents followed the CS and Chirico as they drove to 47 Walling Street in Victor, New York. 47 Walling Street is the known residence of HAMPSON's parents. Shortly after arriving at the location, surveillance agents observed HAMPSON walk to the CS's vehicle, approach the driver's side window, and speak with the CS. After a short

period of time, which included the exchanging of phone numbers and the payment for and transfer of suspected "molly" to the CS, the CS departed the driveway. Shortly after the purchase, DEA SA Bill Reichard drove by 47 Walling Street and observed a 2011 Red Hyundai Sonata, bearing New York license plate CXZ8862, parked in the driveway. A NYS DMV registration check of the vehicle revealed that it is registered to Jarod R. HAMPSON of 711 Helendale Road, Rochester, New York.

12. The CS was followed from 47 Walling Street to the city of Rochester, New York. The CS was observed dropping off Chirico in the vicinity of Park Avenue and Oxford Street. The CS then drove directly to a pre-determined location where he/she met with DEA SA MacMillan and TFO Walder. At approximately 4:50 p.m., the CS turned over a clear, knotted, plastic bag containing approximately one ounce of an off-white crystalline substance. Lab analysis of the off-white crystalline substance performed by the Northeast Regional Laboratory (NERL) indicated that the substance contained 4-bromomethcathinone, otherwise known as "4-BMC". The chemical and pharmacological experts at the DEA's Office of Diversion Control, Drug & Chemical Evaluation Section have determined 4-BMC to be an analogue of Methcathinone, a Schedule I controlled substance. Its effects often mimic that of 3,4-methylenedioxy -N-methylamphetamine, otherwise known as MDMA or ecstacy.

### Controlled Purchase #2

13. On Wednesday, July 16, 2014, a second controlled purchase was negotiated,

this time directly between the CS and HAMPSON. After receiving instructions from DEA SA MacMillan, the CS placed a consensual call to Jarod HAMPSON at (585) 441-2987. There was no answer. However, within a minute, the CS received a phone call back from HAMPSON. In sum and substance, the CS told HAMPSON that he/she was ready to head out to Victor and purchase "molly." The CS told HAMPSON that he/she may be looking to purchase two (2) ounces of "molly" on this occasion. HAMPSON stated that he had one ounce of "molly" on hand, but would have to ask his "guy" if he would be able to deliver a second ounce. The CS stated that he/she would call HAMPSON back when he/she had confirmation that the second ounce was in fact needed.

14. At approximately 1:37 P.M. the CS placed another consensually monitored call to HAMPSON. The CS confirmed that he/she did need two (2) ounces of "molly." HAMPSON stated he was with his girlfriend and her children so he could not drive out to the city to pick up the product from his guy. However, HAMPSON stated that his buddy could bring him the second ounce out to Victor and then they could do the transaction. The CS asked for a time frame of when HAMPSON's guy could deliver the second ounce and asked HAMPSON to call him/her back when he had a time.

15. At approximately 1:43 P.M., HAMPSON called the CS and stated, in sum and substance, that his source would be there in 25 minutes. The CS and HAMPSON agreed to meet at the Dick Sporting Goods store in Victor, New York. The CS asked for a discount based on the fact that he was buying two ounces, and HAMPSON stated that he could give him the price of $1,500.00 for two ounces.

16. The CS was thereafter provided $1,500.00 in government funds by SA MacMillan. His person and vehicle were searched for the presence of any other quantities of narcotics or money, with none located. On that same date, at approximately 1:53 p.m. the CS drove to the Dick's Sporting Goods store in Victor. At approximately 2:23 p.m., the CS received a phone call from HAMPSON in which HAMPSON stated, in sum and substance, that his buddy would be in the area in 10 minutes. HAMPSON stated that he was going to meet with his guy in the same area as the CI so he would be near.

17. At approximately 2:33 p.m., surveillance units observed Jerod HAMPSON depart the residence of 47 Walling Street driving the aforementioned 2011 Red Hyundai Sonata. Surveillance units maintained visual surveillance as the vehicle drove headed toward the Eastview Mall in Victor. At approximately 2:42 p.m., HAMPSON placed another call to the CS wherein he stated, in sum and substance, that he was across the street seeing his buddy and would then head to the Dick's parking lot to complete the deal.

18. At approximately 2:51 p.m., surveillance officers watched as HAMPSON exited his vehicle and walked over to a gold Pontiac Grand Am, bearing New York license plate GPG4101. NYS DMV records indicate that the Pontiac Grand Am is registered to Benjamin A. DIMENTO at 7 Jacques Street, Rochester, NY 14620, the Target Residence. HAMPSON was observed leaning into the passenger side door for approximately one minute. Shortly thereafter, an individual subsequently identified by law enforcement as Benjamin A. DIMENTO exited the driver side of the vehicle. DIMENTO and HAMPSON

spoke for a short time outside the vehicle and then walked in separate directions. HAMPSON re-entered his vehicle and drove directly to the Dick's Sporting Goods store.

19. At approximately 2:54 p.m., SA MacMillan and SA Siuda observed HAMPSON exit his vehicle, walk over and enter the CS vehicle. A recording device was placed inside the CI's vehicle and was monitored by SA Siuda and SA MacMillan. HAMPSON confirmed that the product he was selling to the CS was the same that he had sold the CS previously. HAMPSON weighed out two ounces while inside the vehicle. HAMPSON further confirmed the substance was for human consumption, specifically asking the CS, "Do you like this stuff?" The CS replied, "My guys like it. I don't use this shit, I used to." HAMPSON stated, "I do a little bit." HAMPSON then spoke of his girlfriend and stated "she did it the first night we were together." HAMPSON further indicated during the course of the conversation that the previous order "took forever coming through customs." This indicates to me that this group is ordering their chemical substances on-line and they are being shipped from abroad.

20. At approximately 3:01 p.m. HAMPSON exited the CS vehicle. Under surveillance, the CS departed the area and met with SA Siuda and SA MacMillan at a prearranged location. At approximately 3:05 p.m. the CS handed agents one clear zip-lock bag of an off-white crystalline substance. A subsequent field test of the substance was positive for the presence of MDMA utilizing Reagent Field Test Kit 923. The weight of the substance was approximately 58.9 grams. Lab analysis of the off-white crystalline substance performed by the Northeast Regional Laboratory (NERL) indicated that the substance

contained 4-BMC.

21. After departing the parking lot at Dick's Sporting Goods, HAMPSON was observed driving back to the Eastview Mall parking lot. HAMPSON exited his vehicle and walked up to the gold Grand Am. He opened the gas cap and placed something inside. Shortly thereafter, DIMENTO was observed by SA Plattos returning from inside the mall, opening his gas cap and retrieving an unknown object. At approximately 3:40 P.M., DIMENTO was surveilled driving from the mall directly to Jacques Street. The vehicle was thereafter observed parked directly outside the residence at 7 Jacques Street.

### Controlled Purchase #3

22. On August 7, 2014, investigators assigned to this case utilized the CS to make another controlled purchase of one ounce of "molly" from Jarod HAMPSON. Several recorded calls were placed between the CS and HAMPSON in order to set up the deal. During these phone calls, the CS negotiated for the purchase of a sample of cocaine and one (1) ounce of "Molly" for $850.00. The CS and HAMPSON also agreed upon a location to conduct the transaction.

23. On August 7, 2014, at approximately 12:50 p.m., agents established surveillance in the area of 7 Jacques Street, Rochester, New York. At approximately 1:27 p.m., DEA SA Sabatino Smith observed HAMPSON arrive in a 2011 Red Hyundai Sonata. After parking his vehicle, HAMPSON entered the Target Residence. Approximately two

minutes later, HAMPSON exited the Target Residence and walked towards his vehicle. Shortly thereafter, SA Smith observed HAMPSON return to and enter the residence at 7 Jacques Street. At approximately 1:36 p.m., SA Smith observed HAMPSON exit the residence, return to his vehicle and drive away from the location. Agents maintained surveillance while HAMPSON drove around the north-west side of Rochester without making any stops. HAMPSON drove in a pattern indicative of counter-surveillance tactics. At approximately 2:04 p.m., SA Schmitz observed HAMPSON return to the residence at 7 Jacques Street.

24. Approximately 5 minutes later, SA Smith observed HAMPSON depart the target residence and enter his vehicle. At approximately 2:12 p.m., HAMPSON called the CS and confirmed the meeting location. Shortly thereafter, HAMPSON entered the parking lot at CVS Pharmacy located at the intersection of N. Winton Road and Blossom Road, Rochester, New York. DEA RAC Timothy Kernan observed HAMPSON exit his vehicle and enter the CS's vehicle. The conversation between the CS and HAMPSON was monitored and recorded. During the conversation, HAMPSON can be heard referring to the substance he was selling the CS and stating that "the new batch is way better." HAMPSON went on to say that the new batch "...just came in maybe a week ago." During the course of the conversation, HAMPSON sold the CS approximately one ounce of a white, powdery substance. Once the controlled purchase was finished, the CS exited the parking lot and drove to a pre-determined location to meet with DEA SA MacMillan. There the CS provided SA MacMillan with two baggies containing white powdery substances. The larger bag contained an off-white crystalline substance which later field-

tested positive for the presence of MDMA, a Schedule I controlled substance, utilizing Reagent Test Kit 923. Conclusive lab results of this substance have not been returned yet. The second substance, proffered by HAMPSON to be a sample of cocaine, did field test positive for the presence of cocaine.

25. Following the controlled purchase at the CVS store, DEA agents maintained surveillance of HAMPSON as it drove away from the CVS store. The vehicle was followed directly back to the Target Residence at 7 Jacques Street. DEA SA Schmitz observed HAMPSON exit his vehicle and enter the target residence.

### Controlled Purchase #4

26. On August 28, 2014, under the direction of DEA SA MacMillan and SA Siuda, the CS contacted HAMPSON in order to arrange for the controlled purchase of 31 grams of cocaine and one ounce of "molly". After the negotiation with HAMPSON, DEA agents established surveillance of 7 Jacques Street, Rochester, New York. At approximately 2:51 p.m., while conducting drive by surveillance, SA Schmitz witnessed HAMPSON's 2011 red Hyundai Sonata parked in the area of 7 Jacques Street. Surveillance was unable to observe the vehicle leaving the area. However, at approximately 3:14 p.m. the CS received a phone call from HAMPSON stating that he would arrive at the CVS shortly.

27. Two minutes later, at approximately 3:16 p.m., HAMPSON arrived at the CVS driving the red Hyundai Sonata. An unknown male hispanic was observed seated in

the passenger seat. HAMPSON entered the CS vehicle at which HAMPSON sold the CS a baggie of suspected cocaine and one ounce of suspected "molly." The conversation between the CS and HAMPSON was monitored and recorded. During the course of the conversation, HAMPSON was heard stating "here's the molly". The CS later referred to the "molly" and stated "this shit is speedy." HAMPSON then asked the CS, "Did you try it?" Later in the conversation, HAMPSON stated, "I do the molly maybe once every 2 to 3 weeks."

28. After the completion of the controlled purchase, the CS departed the parking lot and met immediately with law enforcement. The CS presented SA MacMillan and SA Siuda with two plastic baggie containing an off-white crystalline substance. This substance later field tested positive for the presence of MDMA utilizing Reagent Test Kit 923. Conclusive lab results for this substance have not been returned yet. The suspected cocaine did test positive for the presence of cocaine.

29. After the controlled purchase, surveillance units also maintained contact with HAMPSON's vehicle as it departed the CVS parking lot. At 3:33 p.m., HAMPSON arrived at the area of 7 Jacques Street, parked his vehicle and entered the Target Residence.

### Controlled Purchase #5 and Arrests of HAMPSON and DIMENTO

30. Beginning on or about September 3, 2014, your affiant met with the CS with the purpose of initiating another controlled purchase of suspected controlled substance

analogues from Jarod HAMPSON. After a series of recorded phone calls and texts, it was ultimately agreed that HAMPSON would be able to deliver to the CS an order for 5 ounces of "molly."

31. On September 9, 2014, at approximately 3:11 p.m., the CS called HAMPTON and advised him that he wanted to meet at the Tops Plaza located at 1900 South Clinton Avenue, Brighton, New York to complete the deal. Shortly thereafter, surveillance agents observed HAMPTON exit 7 Jacques Street, the residence belonging to Benjamin DIMENTO. HAMPTON then entered his red Hyundai Sonata and was followed to the Tops Plaza. HAMPTON exited his vehicle and entered the CS's vehicle. Moments later, the CS exited his vehicle to give a pre-arranged signal. Numerous agents then converged on the vehicle. HAMPSON was located sitting in the front passenger seat of the vehicle. A small, brown cardboard box was located within arms length of HAMPSON. Inside the box, agents located five separate knotted baggies containing an off-white crystalline substance, similar in nature to the previous controlled purchases. This substance field tested positive for the presence of MDMA utilizing Reagent Test Kit 923.

32. On September 9, 2014, at approximately 4:00 p.m., agents executed a federally issued search warrant at the Target Residence, locating Benjamin DIMENTO inside the location. During the execution of the search, DIMENTO was observed throwing objects out of a window from the residence, including additional quantities of suspected analogue substances and scales. In a post-Miranda interview, DIMENTO admitted that he believed the substance to be MDMA.

## Conclusion

33. Based on the foregoing, I submit there is probable cause to believe that that from in or about July 2014 to in or about September 9, 2014, the defendants, Jarod Hampson and Benjamin Dimento, did knowingly, willfully and unlawfully combine, conspire and agree together and with others, known and unknown, to commit the following offenses, that is, to possess with the intent to distribute, and to distribute, a mixture and substance containing 3,4-methylenedioxy-N-methylamphetamine, otherwise known as MDMA or ecstacy, a Schedule I controlled substance, and 4-bromomethcathinone (4-BMC), a Schedule I controlled substance analogue as defined in Title 21, United States Code, Section 802(32), knowing that the mixture and substance was intended for human consumption as provided in Title 21, United States Code, Section 813, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) and 846.

_____
William MacMillan
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
this 9th day of September, 2014.

_____
HON. MARIAN W. PAYSON
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF NEW YORK